**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JUNE 6, 2007

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

No. 131041

COREY RAMONE FRAZIER,

Defendant-Appellee.

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

This 1995 murder case has a long history in the Michigan and federal courts. Following the affirmance of defendant's convictions in our state courts, the United States District Court for the Eastern District of Michigan, on habeas corpus review, ordered defendant's release unless he was given a new trial in which his confession would be excluded from evidence. The district court ordered this result because of retained counsel's deficient performance, not because of any police misconduct.

During pretrial hearings, the trial court also suppressed the testimony of two witnesses—street sweepers whose identities were "fruits" of defendant's

confession—unless the prosecution could show that it discovered the street sweepers' identities from an independent source. Following the prosecution's interlocutory appeal, the Court of Appeals agreed that the trial court should conduct an "inevitable discovery" hearing.

We granted the prosecution's application for leave to file an interlocutory appeal to consider the proper scope of the exclusionary rule as it applies to the testimony of the street sweepers. We reverse the Court of Appeals expansive holding that the exclusionary rule applies to the testimony of the street sweepers. Because defendant's confession did not result from police misconduct, the purpose of the exclusionary rule is in no way served by excluding the street sweepers' testimony. Further, the degree of attenuation between the violation of defendant's Sixth Amendment rights and the street sweepers' testimony dissipated any taint.

We also vacate the Court of Appeals endorsement of the federal district court's errant legal analysis in holding that defendant's confession must be excluded. The district court mistakenly applied the test from *United States v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984), rather than the test from *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), in holding that defendant's Sixth Amendment rights had been violated. Nonetheless, despite the federal district court's faulty analysis, we acknowledge the binding force of the district court's ruling excluding defendant's confession.

2

We remand this case for retrial at which the street sweepers' testimony may be admitted.[1]

## I. UNDERLYING FACTS AND PROCEDURAL HISTORY

Two victims were robbed and fatally shot in one of the victim's homes in Grand Blanc, Michigan. Kenneth Haywood told the police that he drove defendant and defendant's accomplice, Idell Cleveland, to the home on the night of the murders and waited in the car while defendant and Cleveland entered the home. Haywood heard Cleveland say, "Get on the floor" and then heard two gunshots. Haywood fled, leaving defendant and Cleveland in the house without transportation from the scene.

After interrogating Haywood, the police searched defendant's home and obtained an arrest warrant. Defendant's mother retained an attorney for him. Defendant told that attorney that, although he had been present when Cleveland robbed and murdered the victims, he did not know that Cleveland intended to rob the victims and he had not been involved in the murders. Defendant told counsel that he wanted to talk to the police about his noninvolvement in the crimes. Relying on defendant's assertions of innocence, defense counsel advised defendant that one option would be to talk to the police and tell the truth. Counsel then arranged defendant's surrender and accompanied him to the station, where

---

[1] We do not disturb the Court of Appeals holding that defendant's statements are admissible for impeachment purposes, which is not at issue in this appeal.

3

defendant was arrested and later arraigned. Although the prosecutor told defendant and his counsel that he would not plea bargain or make any "deals," defendant nonetheless insisted on talking to the police. Defense counsel also advised defendant that talking to the police might assist in efforts to negotiate a plea bargain. Defense counsel was present when the police furnished *Miranda*[2] warnings and when defendant waived those protections. Defense counsel then left the police station before defendant was interrogated because he assumed that he could not be present during questioning.

During the police interrogation, defendant, contrary to what he told defense counsel, admitted that he knew Cleveland had been armed and had intended to rob the victims. He also admitted that Cleveland paid him with two $50 bills after the murders. He told the police that two street sweepers gave him a ride home after the murders and that he asked them to change a $50 bill. The police later located the street sweepers, who testified that defendant approached them for a ride at a gas station and asked if they had change for a $50 bill.

Following his 1996 jury trial, defendant was convicted of two counts of felony-murder, MCL 750.316; one count of armed robbery, MCL 750.529; and two counts of possession of a firearm during the commission of a felony, MCL 750.227b. The Court of Appeals initially affirmed defendant's murder and felony-firearm convictions, but vacated his armed robbery conviction on double jeopardy

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

4

grounds. *People v Frazier*, unpublished opinion of the Court of Appeals, issued February 27, 1998 (Docket No. 193891). The Court of Appeals then granted rehearing and again vacated defendant's armed robbery conviction on double jeopardy grounds, but remanded "for a *Ginther*[3] hearing on the issue whether defendant was denied the effective assistance of counsel by trial counsel's advice that he made statements to the police about his role in the crime." *People v Frazier (On Rehearing)*, unpublished opinion per curiam of the Court of Appeals, issued August 7, 1998 (Docket No. 193891), slip op at 2. On remand, the trial court concluded after a *Ginther* hearing that counsel had not been ineffective. The Court of Appeals affirmed, *People v Frazier (After Remand)*, unpublished opinion per curiam of the Court of Appeals, issued April 21, 2000 (Docket No. 193891), and this Court denied leave to appeal, 464 Mich 851 (2001).

The United States District Court for the Eastern District of Michigan conditionally granted defendant's petition for a writ of habeas corpus on the ground that counsel abandoned defendant during the police interrogation in violation of defendant's Sixth Amendment right to counsel under *Cronic, supra*. *Frazier v Berghuis*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued August 6, 2003 (Docket No. 02-CV-71741DT). The federal district court ruled that counsel's absence during a critical stage (the interrogation) "tainted the whole trial process, as evidenced by the use

_____

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

5

of Petitioner's statements at trial." *Id.*, slip op at 7. The court held that "the only appropriate remedy is to not allow use of the tainted statements, should the State decide to initiate a new trial in this matter." *Id.* Thus, the district court ruled that defendant's confession would be inadmissible on retrial. The prosecution did not further appeal this decision.

The case was then set for retrial in the Genesee Circuit Court. Before trial, the trial court excluded defendant's custodial statements for all purposes. The court, citing *Wong Sun v United States*, 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963), also held that the exclusionary rule applied to any derivative evidence from those statements, including the testimony of the street sweepers. The court stated that "knowledge gained by the government's own wrong cannot be used by it in the way proposed." The court also held, however, that the prosecution could call the street sweepers to testify at trial if the prosecution could establish that it in fact discovered the identity of these witnesses from a source independent of defendant's inadmissible statements. The prosecution appealed.[4]

A split Court of Appeals panel affirmed in part and reversed in part. *People v Frazier*, 270 Mich App 172; 715 NW2d 341 (2006). The majority first agreed with the federal district court that the prosecution could not use defendant's custodial statements in its case-in-chief because counsel had abandoned defendant

---

[4] Because the prosecution appealed the trial court's decision, the trial court never held a hearing regarding whether the police would have inevitably discovered the street sweepers' identities.

6

at a critical stage of the proceedings (the police interrogation).[5] But the panel, citing *Michigan v Harvey*, 494 US 344; 110 S Ct 1176; 108 L Ed 2d 293 (1990), unanimously[6] reversed the trial court's order prohibiting the use of defendant's custodial statements for impeachment purposes.

The majority next held that the exclusionary rule and the "inevitable discovery" doctrine applied to the street sweepers' testimony. The majority explained that the United States Supreme Court has applied the exclusionary rule to Sixth Amendment violations, and that the street sweepers' testimony is "fruit of the poisonous tree" that must be excluded unless the prosecution can make an affirmative showing that the street sweepers' identities would have inevitably been discovered through alternative means.[7] The majority remanded to the trial court for application of the inevitable discovery doctrine.

---

[5] In his partial dissent, Judge Talbot stated that whether defendant's Sixth Amendment rights were violated was not an issue before the Court. Judge Talbot stated that he was not sure of the correctness of the federal district court's decision that defendant was denied his right to counsel, but that the Court of Appeals was bound by the unchallenged federal court determination.

[6] Judge Talbot joined the majority on this point.

[7] But the panel disagreed with the trial court that the prosecution was required to show that it *actually* discovered the street sweepers' identities through independent legal means.

Judge Talbot dissented from the majority's holding that the exclusionary rule and the inevitable discovery doctrine apply to the street sweepers' testimony. He opined that the exclusionary rule does not apply in the absence of police misconduct, and that the majority extended the doctrine by applying it to the testimony of witnesses named in defendant's statement to police. Further, Judge Talbot opined that the police almost certainly would have discovered the identities of the street sweepers if defense counsel had been present at the interrogation or even if defendant had not made any statement to the police.

This Court granted the prosecution's application for leave to appeal and denied defendant's application for leave to cross-appeal. *People v Frazier*, 477 Mich 851; 720 NW2d 747 (2006). We directed the parties to address the following issues:

> (1) whether the exclusionary rule applies to fruits of a confession extracted not by police misconduct, but by the abandonment of retained counsel during the interrogation, a critical stage of proceedings, in violation of *United States v Cronic,* 466 US 648 (1984); and, if so, (2) whether the inevitable discovery doctrine of *Nix v Williams,* 467 US 431 (1984), applies in such circumstances; and, if so, (3) whether the exclusionary rule should be applied narrowly as suggested in *United States v Ceccolini,* 435 US 268 (1978), when the information derived from the confession is the identity of witnesses. [477 Mich 851.]

## II. STANDARD OF REVIEW

A lower court's application of constitutional standards is not entitled to the same degree of deference as are factual findings. *People v Jenkins*, 472 Mich 26,

8

31; 691 NW2d 759 (2005). Application of the exclusionary rule to a constitutional violation is a question of law that is reviewed de novo. *Id.*

### III. THE *CRONIC*/*STRICKLAND* STANDARDS

The prosecution initially urges us to ignore the federal district court's decision and hold that the exclusionary rule does not apply to bar defendant's confession from evidence. We decline this invitation because the prosecution has forfeited this argument. The prosecution never challenged the adverse district court decision by appealing to the United States Court of Appeals for the Sixth Circuit. Nor did the prosecution argue in the trial court or in our Court of Appeals that the federal district court decision should be disregarded. "This Court disfavors consideration of unpreserved claims of error." *People v Carines*, 460 Mich 750; 761; 597 NW2d 130 (1999). Moreover, the prosecution conceded in its application for leave to appeal in this Court that it is "bound by the unchallenged federal court determination." (Prosecution's Application for Leave to Appeal, p v.) We decline to consider the prosecution's argument urging us to disregard the federal district court decision. Thus, the present issue is not the admissibility of defendant's confession, but the admissibility of the street sweepers' testimony.

In any case,

[h]abeas corpus decisions within their scope generally are binding on the parties, on other courts, and are conclusive. . . . A judgment in habeas corpus discharging the prisoner, after a final determination of the ultimate facts and of the law, is conclusive of the right to remain at liberty. Therefore, the release by federal courts of one charged in state courts is binding on the latter, and there can be no further

9

prosecution. [4 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 147:117, p 793.]

See also *Collins v Loisel*, 262 US 426, 430; 43 S Ct 618; 67 L Ed 1062 (1923) (holding that a habeas corpus decision operates as res judicata on the issues of law and fact necessarily involved in the habeas corpus proceedings); *Kurtz v State*, 22 Fla 36, 45 (1886) ("[I]n those States where a judgment of a court in a *habeas corpus* proceeding discharging or remanding to custody a prisoner is final, and a writ of error is allowed thereon, . . . the principle of *res adjudicata* [seems to be] applicable . . . .").[8] In cases where the federal court conditionally grants a writ of habeas corpus, the federal court retains jurisdiction to ensure that the state court complies with the terms of the conditional writ. *Gentry v Deuth*, 456 F3d 687, 692 (CA 6, 2006). A state's failure to cure the error identified in the conditional habeas court order justifies the release of the petitioner. *Id.* Moreover, we decline to contradict the federal court decision because doing so would create unnecessary confusion and uncertainty. Therefore, we accept as binding the district court's ruling that defendant's confession must be excluded on retrial.

Nonetheless, because our Court of Appeals approved of the federal district court's legal analysis in a published opinion, we must discuss the correctness of

---

[8] Although the federal district court's habeas decision is binding on the parties in this particular case, it is not binding precedent for other cases. See *Abela v Gen Motors Corp*, 469 Mich 603, 606-607; 677 NW2d 325 (2004) ("Although state courts are bound by the decisions of the United States Supreme Court construing federal law, there is no similar obligation with respect to decisions of the lower federal courts." [Citations omitted.]).

this analysis.[9] We agree with the prosecution that the correct Sixth Amendment analysis is the ineffective assistance of counsel test of *Strickland, supra*, rather than the presumed prejudice test of *Cronic, supra*.

Most claims of ineffective assistance of counsel are analyzed under the test developed in *Strickland, supra*. Under this test, counsel is presumed effective, and the defendant has the burden to show both that counsel's performance fell below objective standards of reasonableness, and that it is reasonably probable that the results of the proceeding would have been different had it not been for counsel's error. *Strickland, supra* at 687, 690, 694. But in *Cronic, supra* at 659-662, the United States Supreme Court identified three rare situations in which the

---

[9] The dissent would have us leave unquestioned the federal district court's analysis. But the Court of Appeals opinion approving the district court's analysis is published and is binding precedent for the Court of Appeals and lower courts. MCR 7.215(J)(1). Even if the Court of Appeals approval of the district court's opinion is dicta, we will not allow that dicta to stand when it appears in a precedentially binding opinion and is erroneous. We decline to follow the dissent's suggestion to vacate the Court of Appeals dicta without any explanation of why we are doing so. Rather, the parties and the bench and bar benefit when we explain the reasoning underlying our rulings. Further, although the district court's decision is binding on the admissibility of defendant's confession, the district court did not decide whether the street sweepers' testimony is admissible. If defendant is convicted on retrial, this issue will likely be raised on appeal in the Michigan courts and on habeas review in federal court. Our review of this issue at this juncture will aid those courts that might be required to review this issue in the future. It will also contribute to the broader debate regarding the proper application of the *Cronic* and *Strickland* standards.

We also reject the dissent's suggestion that we have not genuinely attempted to execute the federal order. We have complied with that order, contrary to the prosecution's request that we violate the order by admitting defendant's confession. See n 16 of this opinion.

attorney's performance is so deficient that prejudice is presumed. One of these situations involves the complete denial of counsel, such as where the accused is denied counsel at a "critical stage" of the proceedings.[10] *Id.* at 659. "For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, [the] difference is not of degree but of kind." *Bell v Cone*, 535 US 685, 697; 122 S Ct 1843; 152 L Ed 2d 914 (2002).

This case falls within the ambit of *Strickland* because none of the three *Cronic* situations is present. In their first meeting, defendant misled counsel. He said that he was present at the crime scene, but did not know that Cleveland intended to rob the victims. Defendant *insisted* on waiving his right to counsel and maintaining his innocence in a statement to the police in order to obtain a favorable plea bargain.[11] Counsel advised defendant of the risks of talking to the police and even advised him not to talk to the police despite his claims of

---

[10] The other two situations in which prejudice is presumed are as follows: (1) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (2) where counsel is called upon to render assistance under circumstances where competent counsel very likely could not. *Cronic, supra* at 659-660.

[11] In this postarraignment interrogation case, defendant had a Sixth Amendment right to counsel at the police interrogation, a critical stage of the proceedings. *Michigan v Jackson*, 475 US 625, 629-630; 106 S Ct 1404; 89 L Ed 2d 631 (1986). But an accused may waive his Sixth Amendment right to counsel if the waiver is knowing, intelligent, and voluntary. *People v Williams*, 470 Mich 634, 640; 683 NW2d 597 (2004). Defendant may, of course, even waive counsel at a critical stage of the proceedings. See, e.g., *United States v Wade*, 388 US 218, 237; 87 S Ct 1926; 18 L Ed 2d 1149 (1967) (holding that the defense counsel was
(continued…)

innocence. Counsel, however, relied on defendant's assertions of innocence in advising defendant that he could talk to the police. Counsel's advice was predicated on defendant's false claim of innocence, and counsel cannot be faulted for advising defendant on the facts defendant had communicated to him.[12] What defendant ultimately told the police and what he told defense counsel were two different things. If defendant had given counsel the same version of events that he furnished the police, counsel would most likely have advised defendant differently.

The *Cronic* test applies when the attorney's failure is *complete*, while the *Strickland* test applies when counsel failed at specific points of the proceeding. *Bell, supra* at 697. Because counsel consulted with defendant, gave him advice, and did nothing contrary to defendant's wishes, counsel's alleged failure was not complete. Defendant alleges only that counsel erred at a specific point of the proceeding by advising him that he could waive his right to counsel at the

---

(…continued)
required to be present at the lineup—a "critical stage"—absent an "intelligent waiver" by the defendant).

[12] Additionally, counsel, relying on the previous experience, believed that the prosecution might change its position and make a plea offer after defendant talked to the police.

13

interrogation. Therefore, prejudice may not be presumed, and counsel's performance should have been reviewed under the *Strickland* standard.[13]

Our determination that *Strickland* rather than *Cronic* applies is supported by *Roe v Flores-Ortega*, 528 US 470; 120 S Ct 1029; 145 L Ed 2d 985 (2000). In *Roe, supra,* the United States Supreme Court analyzed counsel's failure to file an appeal under the two-pronged test set forth in *Strickland* rather than the presumption of prejudice test set forth in *Cronic.* In doing so, it stated that the decision to waive the right to appeal, much like the decision to plead guilty and waive the right to a jury trial, belonged to the defendant. *Id.* at 485. The Court stated that when an attorney consults with his client about the consequences of his client's decision, the attorney's performance can be considered deficient under the first prong of *Strickland* only if the attorney fails to follow his client's express instructions. *Id.* at 478.

The applicability of *Strickland* is even more apparent in the instant case than in *Roe, supra*. In this case, defendant's attorney consulted with defendant and discussed the risks of talking to the police. As in *Roe*, the decision to talk to the police and, thus, to waive the right against compelled self-incrimination and

---

[13] Although we hold that the federal district court should have applied the *Strickland* standard, we do not apply the *Strickland* test to the facts of this case or offer any opinion regarding the effectiveness of counsel.

14

the right to counsel's presence during interrogation, belonged to defendant.[14]

Defendant insisted on talking with the police in order to obtain a favorable plea bargain. Thus, the 2000 Court of Appeals panel correctly applied the *Strickland* standard rather than the *Cronic* standard in affirming the trial court's finding after a *Ginther* hearing that defense counsel had not been ineffective.[15] The federal district court erred in holding that defendant was entitled to relief without determining whether defendant was prejudiced by counsel's performance. Accordingly, we vacate the March 2006 published Court of Appeals opinion to the extent that it adopts or approves of the federal district court's decision endorsing the *Cronic* standard. Because we are bound by the federal district court's ruling on habeas review, we cannot disturb the erroneous ruling of the district court.[16]

---

[14] We reject defendant's argument that his waiver of counsel was not knowing and intelligent because it was made on the advice of defense counsel. The 1998 Court of Appeals panel decided that defendant's waiver of counsel was valid. The federal district court's failure to analyze whether defendant's waiver of counsel was valid further illustrates its faulty reasoning in concluding that *Cronic* rather than *Strickland* applies.

[15] This Court denied leave to appeal that decision. 464 Mich 851 (2001).

[16] We reject the dissent's argument that we have foreclosed any possibility of holding that the derivative evidence (the street sweepers' testimony) should be excluded by "flatly refus[ing] to accept the validity of the district court's order." *Post* at 6. As we have clearly stated, we recognize that the district court's ruling is binding, and we accept for purposes of this case that defendant's Sixth Amendment rights were violated and that his confession must be excluded. We have scrupulously honored the district court's order, which provides, in pertinent part:

> [T]he only appropriate remedy is to not allow use of [defendant's] tainted statements, should the State decide to initiate a new trial in this matter.

(continued…)

15

## IV.  APPLICABILITY OF THE EXCLUSIONARY
## RULE TO THE STREET SWEEPERS' TESTIMONY

We next consider the Court of Appeals ruling that the exclusionary rule applies to the "fruit" of defendant's confession—the testimony of the street sweepers.[17]  We conclude that the Court of Appeals erred in holding that the exclusionary rule applies.

The suppression of evidence should be used only as a last resort.  *Hudson v Michigan*, ___ US ___; 126 S Ct 2159, 2163; 165 L Ed 2d 56 (2006).  "[T]he exclusionary rule is 'a harsh remedy designed to sanction and deter police misconduct where it has resulted in a violation of constitutional rights . . . .'"  *People v Anstey*, 476 Mich 436, 447-448; 719 NW2d 579 (2006), quoting *People v*

_____

(…continued)

\* \* \*

> The Court ORDERS that the warden release Petitioner from custody, unless the State of Michigan initiates a new trial in this case, consistent with this Court's Opinion, within one hundred and twenty (120) days from the entry of this Order.  [*Frazier v Berghuis, supra*, slip op at \*7-8.]

The district court did not rule on the admissibility of the street sweepers' testimony.  In compliance with the district court's order, we are remanding for a new trial in which defendant's confession must be excluded from evidence.  Our disagreement with the district court's ruling regarding the admissibility of defendant's statements in no way affects our ruling regarding the admissibility of the street sweepers' testimony.

[17] "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"  *Segura v United States*, 468 US 796, 804; 104 S Ct 3380; 82 L Ed 2d 599 (1984) (internal citations omitted).

16

*Hawkins*, 468 Mich 488, 512-513; 668 NW2d 602 (2003) (emphasis deleted); see also *Michigan v Tucker*, 417 US 433, 446; 94 S Ct 2357; 41 L Ed 2d 182 (1974), quoting *United States v Calandra*, 414 US 338, 347; 94 S Ct 613; 38 L Ed 2d 561 (1974) ("[T]he exclusionary rule's 'prime purpose is to deter future unlawful police conduct . . . .'"). "'The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.'" *Id.*, quoting *Elkins v United States*, 364 US 206, 217; 80 S Ct 1437; 4 L Ed 2d 1669 (1960).[18] The judicially created rule is not designed to act as a personal constitutional right of the aggrieved party. *Calandra, supra* at 348.[19] "[T]he

---

[18] While courts must be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for applying the exclusionary rule. *Stone v Powell*, 428 US 465, 485; 96 S Ct 3037; 49 L Ed 2d 1067 (1976).

[19] In *Stone, supra* at 488 n 24, the United States Supreme Court quoted Professor Anthony Amsterdam:

> "The rule is unsupportable as reparation or compensatory dispensation to the injured criminal; its sole rational justification is the experience of its indispensability in 'exert[ing] general legal pressures to secure obedience to the Fourth Amendment on the part of . . . law-enforcing officers.' As it serves this function, the rule is a needed, but grud[g]ingly taken, medicament; no more should be swallowed than is needed to combat the disease. Granted that so many criminals must go free as will deter the constables from blundering, pursuance of this policy of liberation beyond the confines of necessity inflicts gratuitous harm on the public interest...." Search, Seizure, and Section 2255: A Comment, 112 U. Pa. L. Rev. 378, 388-389 (1964) (footnotes omitted).

proper focus is on the deterrent effect on law enforcement officers, if any."

*People v Goldston*, 470 Mich 523, 539; 682 NW2d 479 (2004).

"Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *Calandra, supra* at 348.

> "The exclusionary rule has its limitations . . . as a tool of judicial control. . . . [In] some contexts the rule is ineffective as a deterrent. . . . Proper adjudication of cases in which the exclusionary rule is invoked demands a constant awareness of these limitations. . . . [A] rigid and unthinking application of the . . . rule . . . may exact a high toll in human injury and frustration of efforts to prevent crime." *Terry v Ohio*, [392 US 1, 13-15; 88 S Ct 1868; 20 L Ed 2d 889 (1968)]. [*People v Stevens (After Remand)*, 460 Mich 626, 636; 597 NW2d 53 (1999).]

"[A]pplication of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served," *Calandra, supra* at 348, "that is, 'where its deterrence benefits outweigh its "substantial social costs,"'" *Hudson, supra* at 2163, quoting *Pennsylvania Bd of Probation & Parole v Scott*, 524 US 357, 363; 118 S Ct 2014; 141 L Ed 2d 344 (1998), quoting *United States v Leon*, 468 US 897, 907; 104 S Ct 3405; 82 L Ed 2d 677 (1984). "Because the exclusionary rule precludes consideration of reliable, probative evidence, it imposes significant costs: it undeniably detracts from the truthfinding process and allows many who would otherwise be incarcerated to escape the consequences of their actions." *Scott, supra* at 364. The United States Supreme Court has "repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the

18

rule." *Id.* at 364-365. Because of the costs associated with applying the exclusionary rule, the Court has been cautious against expanding it. *Hudson, supra* at 2163. In determining whether exclusion is proper, a court must "'evaluate the circumstances of [the] case in the light of the policy served by the exclusionary rule . . . .'" *Stevens, supra* at 635, quoting *Brown v Illinois*, 422 US 590, 604; 95 S Ct 2254; 45 L Ed 2d 416 (1975).[20]

It cannot be gainsaid that this case presents *no* police misconduct whatsoever. Excluding defendant's confession because of attorney error does not fulfill the goal of the exclusionary rule by deterring the police from future misconduct. *Goldston, supra* at 538.

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good

---

[20] The dissent cites *United States v Wade*, 388 US 218, 240-241; 87 S Ct 1926; 18 L Ed 2d 1149 (1967), and *Massiah v United States*, 377 US 201, 207; 84 S Ct 1199; 12 L Ed 2d 246 (1964), for the proposition that the exclusionary rule is an appropriate remedy for a Sixth Amendment violation. But those cases do not hold that derivative evidence discovered without any police misconduct whatsoever must be excluded from evidence. In both *Wade* and *Massiah*, the defendant's Sixth Amendment rights were violated because of police misconduct. See *Wade, supra* at 220 (an FBI agent conducted a pretrial lineup [a critical stage of the proceedings] without notice to and in the absence of the defendant's attorney); *Massiah, supra* at 201 (federal agents, without notice to the defendant's attorney, arranged a meeting between the defendant and an accomplice turned informant and eavesdropped on the conversation). No such police misconduct occurred here.

faith, however, the deterrence rationale loses much of its force. [*Tucker, supra* at 447.]

This Court has previously opined that application of the exclusionary rule is inappropriate in the absence of governmental misconduct. See, e.g., *Goldston, supra* at 538 ("[T]he goal of the exclusionary rule would not be furthered where police officers act in objectively reasonable good-faith reliance on a search warrant."); *People v Elston*, 462 Mich 751, 764; 614 NW2d 595 (2000) ("Because defendant failed to allege or establish a specific discovery violation, or any other sort of prosecutorial misconduct, the trial court lacked a basis upon which to punish the prosecutor by suppressing otherwise admissible evidence."). Moreover, application of the exclusionary rule in these circumstances further encroaches "'upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.'" *Calandra, supra* at 351, quoting *Alderman v United States*, 394 US 165, 175; 89 S Ct 961; 22 L Ed 2d 176 (1969). Because the street sweepers' identities were not obtained as a result of any police misconduct, the Court of Appeals erred in applying the exclusionary rule to their testimony.

We agree with Judge Talbot that *Tucker* supports this conclusion. In *Tucker,* the defendant was interrogated before the United States Supreme Court had decided *Miranda, supra*, but the *Miranda* decision nonetheless applied because it had been decided before defendant's trial. During the interrogation, the police did not inform the defendant, as they were required to do after *Miranda,*

20

that counsel would be appointed if the defendant could not afford one. *Id.* at 436.

During questioning, the defendant named an alibi witness. *Id.* The witness, rather than confirming the defendant's alibi, discredited his story. *Id.* at 436-437.

The *Tucker* Court held that the exclusionary rule did not apply to the witness's testimony. *Id.* at 452. The Court explained that the police conduct was a departure from later-enacted "prophylactic standards" rather than actual misconduct, so the exclusion of the illegally obtained derivative evidence would not deter future misconduct. *Id.* at 446.[21] The Court also emphasized that the evidence at issue was not a statement by the defendant, but was rather the testimony of a witness whom the police discovered as a result of the defendant's statements, so that "the reliability of [the] testimony was subject to the normal testing process of an adversary trial." *Id.* at 449.

The instant case offers even stronger grounds than *Tucker* against excluding the testimony of the witnesses. Both Tucker and defendant gave statements without counsel present and identified witnesses in their statements. But while Tucker was advised of only some of his rights before waiving his right to counsel, defendant was advised of *all* of his *Miranda* rights before waiving his right to

---

[21] We reject the dissent's contention that *Tucker* is inapplicable because the *Tucker* defendant's Sixth Amendment rights were not violated. The dissent ignores that the *Tucker* Court based its holding that the exclusionary rule did not apply to the derivative evidence on the narrow ground that the deterrence rationale of the exclusionary rule would not be fulfilled by excluding the evidence, because the police did not engage in misconduct. *Tucker, supra* at 447-448. We base our holding on the same ground.

21

counsel. Tucker did not have counsel present when he waived his right to counsel, while defendant did. There was no police misconduct in either case. In both cases, the confession was suppressed, but in *Tucker*, the witness identified during the confessions was permitted to testify. The same outcome should pertain here. Here, as in *Tucker*, no deterrent purpose would be served by barring the witnesses' testimony. Moreover, the propriety of this outcome is reinforced here, as in *Tucker*, because witnesses were not subjected to custodial pressures, and would be subject to cross-examination.

Our holding is also supported by *People v Kusowski*, 403 Mich 653; 272 NW2d 503 (1978). In *Kusowski, supra* at 662, this Court, citing *Ceccolini* and *Tucker*, held that the exclusionary rule does not apply to third-party testimony discovered as a result of a *Miranda* violation. This Court explained that "the interest in preventing future police conduct which violates *Miranda* does not justify depriving the government of use of the evidence." *Kusowski, supra* at 662.

Further, even if defendant's confession had been obtained as a result of police misconduct, we hold that the exclusionary rule would not apply to the street sweepers' testimony. Under the attenuation exception to the exclusionary rule, exclusion is improper when the connection between the illegality and the discovery of the challenged evidence has "'become so attenuated as to dissipate the taint,'" *Wong Sun, supra* at 487, quoting *Nardone v United States*, 308 US 338, 341; 60 S Ct 266; 84 L Ed 307 (1939). Attenuation can occur when the causal connection is remote or when "the interest protected by the constitutional

22

guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson, supra* at 2164.

In *Ceccolini, supra* at 276-278, the United States Supreme Court held that the connection between police misconduct and the discovery of witnesses who will testify at trial is often too attenuated to justify application of the exclusionary rule:

> The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness. Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.
>
> *   *   *
>
> . . . Rules which disqualify knowledgeable witnesses from testifying at trial are, in the words of Professor McCormick, "serious obstructions to the ascertainment of truth"; accordingly, "[f]or a century the course of legal evolution has been in the direction of sweeping away these obstructions." C. McCormick, Law of Evidence § 71 (1954). [*Ceccolini, supra* at 276-278.]

The *Ceccolini* Court concluded that "since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." *Id.* at 278.

23

[T]he exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object. [*Id.* at 280.]

Applying these principles, we conclude that the degree of attenuation was sufficient to dissipate the connection between any Sixth Amendment violation and the testimony. *Ceccolini, supra* at 279. The street sweepers testified of their own free will during the first trial, and any violation of defendant's right to counsel during the interrogation played no meaningful part in the street sweepers' willingness to testify. Moreover, we have no indication that their testimony was, or would be in the next trial, coerced.[22] We conclude, as did the *Ceccolini* Court, that, "[t]he cost of permanently silencing [the third-party testimony] is too great for an evenhanded system of law enforcement to bear in order to secure such a speculative and very likely negligible deterrent effect." *Ceccolini, supra* at 280. Because of the remote causal connection between any Sixth Amendment violation

---

[22] The dissent argues that the street sweepers' failure to approach the police within one week of the crimes shows that they were not aware of the murders or did not connect the murders with defendant. But this fact actually supports our conclusion that the street sweepers testified of their own free will. In *Ceccolini, supra* at 279, the Court held that the substantial time that elapsed between the illegal search, the police contact with the witness, and the testimony at trial demonstrated that the witness testified of her own free will. We fail to see how the street sweepers' initial ignorance of the murders demonstrates their unwillingness to testify.

and the discovery of the street sweepers' identities, there is no justification for suppression of the street sweepers' testimony.[23]

In sum, the Court of Appeals erred in holding that the exclusionary rule applies to the street sweepers' testimony. Law enforcement did not engage in any misconduct in obtaining defendant's confession or discovering the identity of the street sweepers, so the goal of the exclusionary rule would not be served by excluding the street sweepers' testimony. In any case, the degree of attenuation

---

[23] The dissent argues,

> In contrast to the situation in *Ceccolini*, the identities of the street sweepers were not known to the investigators, nor were they likely to be uncovered in the course of the police investigation. . . . [I]t appears that the relationship between the identity of the street sweepers and defendant's illegal interrogation is not attenuated because the identities were revealed as a direct result of defendant's interrogation. [*Post* at 13.]

But *Ceccolini, supra* at 277, holds: "'The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.'" (Citation omitted.) The attenuation exception to the exclusionary rule, unlike the inevitable discovery exception, does not focus primarily on the likelihood of discovering a live witness. Rather, *Ceccolini* holds that the attenuation exception applies when the connection between police misconduct and the discovery of witnesses who will testify at trial is too attenuated to justify application of the exclusionary rule. Attenuation can occur when the causal connection is remote or when "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson, supra* at 2164. Here, the attenuation exception applies because the illegality played no meaningful role in the street sweepers' decision to testify, and the costs of excluding the street sweepers' testimony would outweigh the interests served by its suppression.

between the street sweepers' testimony and any violation of defendant's Sixth Amendment rights is sufficient to dissipate any taint.[24]

## V. CONCLUSION

We reverse the Court of Appeals holding that the exclusionary rule applies to the street sweepers' testimony. We further vacate the Court of Appeals endorsement of the federal district court's *Cronic* analysis. We remand for further proceedings consistent with this opinion.

Maura D. Corrigan
Clifford W. Taylor
Elizabeth A. Weaver
Robert P. Young, Jr.
Stephen J. Markman

---

[24] The dissent argues that it is questionable whether the identities of the street sweepers would inevitably have been discovered during the course of the police investigation. We agree. But the inevitable discovery doctrine is an *exception* to application of the exclusionary rule. *Stevens, supra* at 636. Because the exclusionary rule does not apply to the street sweepers' testimony, the inevitable discovery exception is also inapplicable.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                     No. 131041

COREY RAMONE FRAZIER,

      Defendant-Appellee.

_____

CAVANAGH, J. (*dissenting*).

I respectfully dissent from today's decision. In this case, we are called to implement a federal district court's order stemming from defendant's petition for a writ of habeas corpus. Rather than genuinely attempting to execute the federal court's order in our courts, the majority disputes the basis of the order itself and, as a result, frustrates its intended effect.

From the outset, the majority needlessly criticizes the federal district court's legal analysis. We are bound by the district court's holding that defendant's incarceration violated the United States Constitution because the interrogation of defendant violated his Sixth Amendment rights. We are equally bound to enforce the remedy the district court ordered—the exclusion of defendant's confession from any retrial. A judgment in a habeas corpus proceeding is res judicata with regard to the issues of law and fact necessary to

reach the conclusion that the prisoner was illegally in custody. *Collins v Loisel*, 262 US 426, 430; 43 S Ct 618; 67 L Ed 1062 (1923). A state supreme court "may not . . . re-examine and decide a question which has been finally determined by a court of competent jurisdiction in earlier litigation between the parties." *City of Tacoma v Taxpayers of Tacoma,* 357 US 320, 334; 78 S Ct 1209; 2 L Ed 2d 1345 (1958).

Aside from the constraints of res judicata, the federal district court's enforcement power prevents us from deviating from its conditional grant of defendant's petition for a writ of habeas corpus. When conditionally granting a writ of habeas corpus, a federal district court retains jurisdiction to determine whether a party has complied with the terms of its order. *Gentry v Deuth*, 456 F3d 687, 692 (CA 6, 2006). A state's failure to timely cure the error identified by a federal district court in its order justifies the release of the prisoner. *Id*. Accordingly, unless defendant's trial comports with the federal district court's order, he should be released from custody.

Because we are bound to follow the federal district court's order, any statements adopting or disavowing the basis of the order are inconsequential; they cannot influence any decision before us.[1] The majority's disavowal and criticism of the district court's application of *United States v Cronic*, 466 US 648; 104 S Ct

---

[1] The majority suggests that these issues may be raised on appeal if defendant is convicted. But the federal district court order will always bind this particular case because the prosecution failed to appeal the ruling.

2

2039; 80 L Ed 2d 657 (1984), are mere dicta. "[S]tatements concerning a principle of law not essential to determination of the case are obiter dictum and lack the force of an adjudication." *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 597-598; 374 NW2d 905 (1985) (citation omitted). Similarly, the Court of Appeals endorsement of the district court's ruling was also dicta and could have simply been vacated as such.[2] But unlike the Court of Appeals dicta, the majority's dicta is an obstacle to our task—implementing the district court's order in state court proceedings. By questioning the validity of the district court's order excluding defendant's confession from the outset, the majority effectively eliminates the possibility of excluding evidence derived from the confession—the very matter we are called upon to decide.

## I. THE EXCLUSIONARY RULE IN SIXTH AMENDMENT CASES

We are presented with the question whether, when a confession has been obtained in violation of a defendant's Sixth Amendment rights but without police misconduct, the exclusionary rule applies to live-witness testimony that is derived from the tainted confession. The exclusionary rule has long been employed as a

---

[2] The majority characterizes its discussion of *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), and *Cronic* as an explanation of its reasoning. But the majority could have explained why the Court of Appeals statements are dicta without passing judgment on the underlying analysis. "It is not our duty to pass on moot questions or abstract propositions." *Sullivan v State Bd of Dentistry*, 268 Mich 427, 429; 256 NW 471 (1934). I would exercise judicial restraint and reserve such in-depth analysis for a case that properly presents the issue for our review.

remedy for violations of the Sixth Amendment right to counsel. *United States v Wade*, 388 US 218, 240-241; 87 S Ct 1926; 18 L Ed 2d 1149 (1967); *Massiah v United States*, 377 US 201, 207; 84 S Ct 1199; 12 L Ed 2d 246 (1964). "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v Morrison*, 449 US 361, 364; 101 S Ct 665; 66 L Ed 2d 564 (1981).

> [W]hen before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted. [*Id.* at 365.]

The nature of a Sixth Amendment violation supports the use of the exclusionary rule even when the violation occurs because of defense counsel's ineffectiveness or absence rather than government misconduct. "[T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v Washington*, 466 US 668, 684; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Cronic*, *supra* at 658.

The rule distilled from federal authority is that the remedy for Sixth Amendment violations should be tailored to the circumstances to assure the defendant a fair trial. *Morrison*, *supra* at 364. In fashioning an appropriate

remedy, the federal approach has been "to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *Id.* at 365. In this case, the federal district court ruled that "the only appropriate remedy is to not allow use of [defendant's] tainted statements, should the State decide to initiate a new trial in this matter." *Frazier v Berghuis*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued August 6, 2003 (Docket No. 02-CV-71741DT), slip op at 7. The district court recognized that the only proper remedy that would afford defendant a fair trial, while not entirely foreclosing the state's ability to prosecute defendant, was to apply the exclusionary rule to defendant's statements.

The majority contends that an application of the exclusionary rule is inappropriate in the absence of governmental misconduct. *Ante* at 20. But as I noted in *People v Goldston*, 470 Mich 523, 562; 682 NW2d 479 (2004) (Cavanagh, J., dissenting), deterrence of governmental misconduct is not the *sole* purpose of the exclusionary rule. The exclusionary rule also ensures the integrity of judicial proceedings, *Terry v Ohio*, 392 US 1, 12-13; 88 S Ct 1868; 20 L Ed 2d 889 (1968), and closes the courthouse doors "to any use of evidence unconstitutionally obtained . . . ." *Wong Sun v United States*, 371 US 471, 486; 83 S Ct 407; 9 L Ed 2d 441 (1963). The district court never indicated that its ruling was calculated to remedy improper conduct by law enforcement officials; rather, it was a response tailored to the fact of the Sixth Amendment violation itself. It

5

would impair the integrity of our judicial system if defendant's statements could be introduced against him, despite a binding federal ruling that they had been obtained in violation of his Sixth Amendment rights.

The exclusionary rule was applied here to afford defendant a fair trial, not to deter governmental misconduct, but the majority still reasons that the exclusionary rule should not apply to the evidence derived from defendant's confession because no governmental misconduct occurred.[3] *Ante* at 20. But this fails to address the pertinent issue in applying the district court's order—whether excluding the derivative evidence will "neutralize the taint" caused by the interrogation and provide defendant "the effective assistance of counsel and a fair trial." *Morrison*, *supra* at 365. Further, it follows that the majority holds that the derivative evidence should not be excluded, when the majority flatly refuses to accept the validity of the district court's order. If the majority does not agree, and cannot accept for the purposes of this case, that defendant's interrogation constituted a Sixth Amendment violation that can be remedied by applying the exclusionary rule, it is not surprising that the majority finds no basis for excluding the evidence derived from that interrogation.[4] The exclusion of derivative

---

[3] I do not dispute that there was no evidence of police misconduct in this case. But as I have stated here and on other occasions, I disagree that the exclusionary rule is an appropriate remedy only when government misconduct has occurred.

[4] While the underlying Sixth Amendment violation is not a question that is properly before us, because of the majority's extensive review of the matter, I find

(continued…)

6

evidence is premised entirely on the existence of illegally obtained *primary evidence*. By rejecting the premise that the primary evidence should be excluded, the majority forecloses any possibility of holding that the derivative evidence should also be excluded.

## II. DERIVATIVE EVIDENCE

Given that defendant's statement must be excluded from evidence, this Court is presented with the question whether evidence derived from defendant's interrogations, namely, the testimony of two street sweepers whom defendant identified during his conversations with the police, should also be excluded. In deciding whether derivative evidence is admissible, the relevant inquiry is "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun*, *supra* at 488, quoting Maguire, Evidence of Guilt, p 221 (1959).

---

(…continued)

it appropriate to briefly rebut its account. Ample evidence supports the federal district court's ruling. The defect in defense counsel's performance was not merely advising his client to speak to the police despite being told that no plea agreements were being offered; counsel's advice also prompted defendant to waive his right to have counsel present at the interrogation. Notably, at the hearing conducted pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), defense counsel was asked why he was not present during any of defendant's interrogations. He responded, "I don't know that they, one, they would have allowed me to be in there." The validity of defendant's waiver of counsel is seriously questionable when he was receiving advice from an attorney who believed that his presence at his client's postindictment interrogation was subject to approval by the police.

7

Derivative evidence may be admissible if the connection between the illegality and the evidence was "'so attenuated as to dissipate the taint.'" *Wong Sun, supra* at 491, quoting *Nardone v United States*, 308 US 338, 341; 60 S Ct 266; 84 L Ed 307 (1939). For example, *Wong Sun* presented a situation where the defendant was illegally arrested, but lawfully arraigned and released on his own recognizance, and voluntarily returned to the authorities several days later to make a statement, and the statement was deemed sufficiently attenuated from the illegal arrest that it was deemed admissible. *Id.* In this case, defendant disclosed the identities of the street sweepers, Anthony Wright and Wilbert Mack, during a postarraignment interrogation outside the presence of counsel. Defendant told officers that Wright and Mack gave him a ride home after the robbery. The prosecution located these witnesses, and they testified against defendant at his trial, stating that he had asked them for a ride home and sought change for a $50 bill. Defendant had also admitted to officers that codefendant Idell Cleveland gave him two $50 bills following the robbery.

Under the attenuation test of *Wong Sun*, the testimony of Wright and Mack should be excluded from evidence. Their identities were discovered as a direct result of the tainted interrogation. There was no intervening act of free will that dissipated the taint of the Sixth Amendment violation. The majority argues that *Michigan v Tucker*, 417 US 433; 94 S Ct 2357; 41 L Ed 2d 182 (1974), supports the opposite conclusion, but that case is inapplicable. In *Tucker*, the Court held that derivative witnesses could testify although the defendant's own statement had

8

been suppressed because it had been obtained after deficient *Miranda*[5] warnings. *Id.* at 436-437, 450. Notably, from the outset, the *Tucker* opinion distinguished Sixth Amendment violations from the case before it:

> [Defendant] did not, and does not now, base his arguments for relief on a right to counsel under the Sixth and Fourteenth Amendments. Nor was the right to counsel, as such, considered to be persuasive by either federal court below. We do not have a situation such as that presented in *Escobedo v. Illinois*, 378 U.S. 478 [84 S Ct 1758; 12 L Ed 2d 977 (1964)], where the policemen interrogating the suspect had refused his repeated requests to see his lawyer who was then present at the police station. [*Tucker*, *supra* at 438.]

Similarly, *Tucker* also distinguished *Wong Sun*:

> But we have already concluded that the police conduct at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege. [*Id.* at 445-446.]

In sum, *Tucker* made very clear that its holding was based on the condition that there was no constitutional violation, but merely a violation of what it perceived as a procedural safeguard designed to protect the constitutional right against self-incrimination. Because the present case involves a constitutional violation, defendant's case is more analogous to *Wong Sun* than to *Tucker*.

But analysis under the rule of *Wong Sun* does not resolve the inquiry because in this case the derivative evidence is live-witness testimony, which requires special consideration. "[T]he exclusionary rule should be invoked with

---

[5] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

9

much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object." *United States v Ceccolini*, 435 US 268, 280; 98 S Ct 1054; 55 L Ed 2d 268 (1978). Accordingly, in making its suppression decision, a court should take into account the unique factors presented by a live witness. For example, "[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she [would have been] discovered by legal means . . . ." *Id*. at 276. Also, "the cost of excluding live-witness testimony" is often greater than the cost of excluding inanimate evidence, so a "more direct link between the illegality and that kind of testimony is required." *Id*. at 278.

Of course, *Ceccolini* does not stand for the proposition that live-witness testimony should never be excluded. It simply requires the court, when deciding whether discovery of the evidence is attenuated from the illegality, to scrutinize different factors than those in cases involving the exclusion of physical evidence. The court's attenuation analysis should be "appropriately concerned with the differences between live-witness testimony and inanimate evidence . . . ." *Id.* at 278-279.

The first factor in live-witness cases considers the free will of a live witness. In part, it is related to the inevitable discovery doctrine, an exception to the exclusionary rule that allows the admission of illegally obtained evidence if the

evidence would inevitably have been obtained through legal means.[6]  *Nix v Williams*, 467 US 431, 443; 104 S Ct 2501; 81 L Ed 2d 377 (1984).  The nature of live witnesses is that, unlike inanimate objects, they can approach the police voluntarily.  But between the time of the murders and defendant's confessions, approximately one week, Wright and Mack did not approach the police with information about defendant.  This indicates that they did not connect defendant with the crime or were not aware of the murders.  Also relevant to the degree of free will exercised by a witness is whether the illegality played any meaningful part in the witness's willingness to testify.  There is no indication that defendant's

---

[6] While *Ceccolini* does not hold that the discovery of a live witness may *only* be attenuated if that witness would have been inevitably discovered, the likelihood of discovering a live witness remains a significant factor.  *Ceccolini* itself evokes the inevitable discovery doctrine when it notes that "[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be *discovered by legal means*," *Ceccolini*, *supra* at 276 (emphasis added), and that "a determination that the *discovery* of certain evidence is sufficiently . . . independent of the constitutional violation to permit its introduction at trial is not a determination which rests on the comparative reliability of that evidence," *id.* at 278 (emphasis added).  In applying the live-witness factors to Ceccolini's case, the Court observed that "both the identity of [the witness] and her relationship with the respondent were well known to those investigating the case," *id.* at 279, suggesting that the witness's identity would have been discovered regardless of the illegality.  Further, Justice Marshall recognized in his dissent that the *Ceccolini* factors bore resemblance to the inevitable discovery doctrine when he stated:

> [T]he Court's approach involves a form of judicial "double counting."  The Court would apparently first determine whether the evidence stemmed from an independent source or would inevitably have been discovered; if neither of these rules was found to apply, as here, the Court would still somehow take into account the fact that, as a general proposition (but not in the particular case), witnesses

(continued…)

11

illegal interrogation influenced Wright and Mack's decision to testify. In sum, the application of the first *Ceccolini* factor gives mixed results that require balancing by the trial court.

The remaining live-witness factors balance the costs of excluding a live witness with the illegality. Live-witness testimony requires a closer connection to the illegality because "such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby." *Ceccolini, supra* at 277. But this factor is most relevant when the discovery of the live witness is incidental to the illegality. For example, in *Ceccolini*, a police officer discovered in an envelope evidence of a gambling operation while casually visiting with a store clerk. When the officer asked the clerk whom the envelope belonged to, the clerk identified Ceccolini, the defendant. At Ceccolini's trial, both the contents of the envelope and the clerk's testimony were suppressed on the basis that an illegal search had occurred. The United States Supreme Court reversed, stating that "[w]hile the particular knowledge to which [the clerk] testified at trial can be logically traced back to [the officer's] discovery of the policy slips, both the identity of [the clerk] and her

_____

(…continued)
sometimes do come forward of their own volition. [*Id.* at 287-288 (Marshall, J., dissenting).]

12

relationship with the [defendant] were well known to those investigating the case." *Id.* at 279.

In contrast to the situation in *Ceccolini*, the identities of the street sweepers were not known to investigators, nor were they likely to be uncovered in the course of the police investigation. Wright and Mack were strangers to defendant, so the police would have had no reason to interview them as his associates. While it is possible that the prosecution may be able to demonstrate to the contrary, it appears that the relationship between discovering the identities of the street sweepers and defendant's illegal interrogation is not attenuated because the identities were revealed as a direct result of defendant's interrogation.

The Court of Appeals was correct to remand this case to the trial court to consider the *Ceccolini* factors and determine whether the testimony of Wright and Mack would otherwise be admissible under the inevitable discovery doctrine. Because of the trial court's initial ruling, the question whether the identities of the street sweepers would have been inevitably discovered was never addressed. Consequently, the prosecution should be given the opportunity to show that Wright and Mack would have been discovered regardless of defendant's interrogation without counsel. Accordingly, I would affirm the decision of the Court of Appeals.

Michael F. Cavanagh
Marilyn Kelly

13